## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Terry Wagner (R07282),       )
                                 )
            Plaintiff,     )
                                 )     Case No. 21 C 50453
           v.               )
                                 )     Hon. Iain D. Johnston
Wexford Health Source Inc., *et al.*,  )
                                 )
         Defendants.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff's motion to exclude evidence [171] is denied as unnecessary. Defendants' motion for summary judgment [140] is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.

## BACKGROUND

Plaintiff Terry Wagner, an Illinois state prisoner, filed this *pro se*[1] civil rights action pursuant to 42 U.S.C. § 1983 back in December 2021, alleging violations of his constitutional rights arising out of his mental health care and treatment at Dixon Correctional Center. Specifically, Plaintiff claims that Defendants violated his rights by not prescribing him Wellbutrin. Plaintiff also claims that Wexford Health Sources, Inc. maintained unconstitutional policies or practices that prevented him from obtaining Wellbutrin. Defendants have moved for summary

---

[1] Plaintiff initially filed this lawsuit *pro se* and the Court subsequently recruited him counsel. (*See* Dkts. 12, 14, 16, 18.) However, on November 22, 2022, the Court granted recruited counsel's motion to withdraw based on counsel's representation that he could not file an amended complaint consistent with his Rule 11 obligations. (*See* Dkt. 26.) Plaintiff has litigated this case on a *pro se* basis since that time. Plaintiff's March 20, 2023, *pro se* amended complaint (Dkt. 40) is the operative complaint in this case.

judgment. Plaintiff responded to Defendants' motion for summary judgment, and Defendants have replied. For the reasons discussed below, the Court grants Defendants' motion for summary judgment.

## I.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. Rule 56.1 requires the party moving for summary judgment to provide a statement of material facts and a supporting memorandum of law. LR 56.1(a)(1), (2) (N.D. Ill.) (amd. Feb. 18, 2021). The statement of material facts "must consist of concise numbered paragraphs[,]" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(1),(2). When addressing facts in its memorandum of law, the moving party "must cite directly to specific paragraphs in the LR 56.1 statements or responses." LR 56.1(g).

The party opposing summary judgment must submit a supporting memorandum of law and a response to the moving party's statement of facts. LR 56.1(b)(1), (2). A fact may be admitted, disputed, or admitted in part and disputed in part. LR 56.1(e)(2). To dispute an asserted fact, the opposing party "must cite specific evidentiary material that controverts the fact" and explain "how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate[.]" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3).

Here, Defendants filed a Rule 56.1 statement of material facts with their motion for summary judgment. (Dkt. 142.) Consistent with the Local Rules, Defendants also provided

Plaintiff with a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a litigant opposing summary judgment.  (Dkt. 145.)

For his part, Plaintiff submitted a response to Defendants' statement of facts.  (Dkt. 162.) The document is arranged in a confusing manner, as it does not meaningfully correspond to Defendants' facts, does not clearly indicate whether Plaintiff admits or disputes Defendants' facts, and also attempts to assert additional facts.[2]  Separately, Plaintiff submitted a memorandum of law opposing summary judgment.  (Dkt. 163.)

Even generously construed, Plaintiff's response cannot be deemed an appropriate response to Defendants' statement of material facts.

Although courts construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules.").  Local Rule 56.1 "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995);  *see also Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

---

[2]  As Defendants point out in their Reply (*see* Dkt. 167 at pg. 1, objecting to Plaintiff's response and describing it as a "tangled mess" that does not comply with the Local Rules), Plaintiff has taken their factual statements out of order, seemingly grouping together those facts that he purports to admit and those that he purports to dispute.  (*See* Dkt. 162 at pgs. 1-24.)  Despite his apparent grouping technique, his responses does not clearly indicate whether he admits or disputes each of Defendants' factual statements.  (*See id.*)  Further, the facts that Plaintiff has "grouped together" at pages 7-24 and identified as "disputed" suffer from various problems and do not comply with the Local Rules.  The Court will not set forth an exhaustive list here, but notes, for instance, a number of Plaintiff's responses fail to directly respond to Defendants' facts, while others contain legal argument, personal commentary, and/or are argumentative.

Because Plaintiff did not properly respond to Defendants' LR 56.1 statement of facts, the Court accepts Defendants' "uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Similarly, the Court considers Plaintiff's "additional facts" (which he has inserted in his response at pgs. 24-27) only to the extent they are supported by the record or where Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); *see also* Fed. R. Evid. 602.

With these guidelines in mind, the Court turns to the facts of this case, stating those facts as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

## II. Facts

Plaintiff is an inmate at Dixon Correctional Center in Dixon, Illinois, and has been incarcerated there at all times relevant to the allegations of the operative complaint, serving a 30-year sentence for murder and concealing a homicidal death. Plaintiff has no mental health training. (Dkt. 142, Defendant's Statement of Facts, ¶ 1.)

In the operative complaint, Plaintiff alleges that Defendants violated his constitutional rights by not prescribing him Wellbutrin. (Dkt. 40, Plaintiff's *pro se* amended complaint at pgs. 2-7.) Plaintiff also claims that Wexford Health Sources, Inc., formerly the state-contracted provider of prisoner healthcare, maintained unconstitutional policies or practices that prevented him from obtaining Wellbutrin. (*Id.*)

Dr. Pradeep Thapar was and is employed by Wexford to provide services as a psychiatrist at Dixon during all times relevant to the allegations in Plaintiff's amended complaint. As part of his professional duties, he engages in conversation with patients regarding their mental health

symptoms. He will also evaluate any physiological or behavioral symptoms the patient displays that correlate with a mental health disorder. He will provide treatments in a variety of ways, which may include suggesting alternative thought processes and cognitive exercises or the prescription of psychoactive medications. (Dkt. 142 at ¶ 2.)

Dr. Scott McCormick was and is employed by Wexford as a Regional Psychiatrist for Central and Southern Illinois. As part of his professional duties, he will collaborate with other psychiatrists and clinicians within the Illinois Department of Corrections and discuss a patient's mental health symptoms, diagnoses, and treatment plan. Oftentimes, his involvement in a patient's mental health treatment derives from another psychiatrists' request for a non-formulary medication for that patient. In his role with Wexford, Dr. McCormick did not personally provide psychiatric services to Plaintiff at Dixon, and did not interact with him personally. (*Id.* at ¶ 3.)

Dr. Estefani Vela Pinto was and is employed by Wexford Health Sources, Inc. as a Regional Psychiatrist for the Region of Northern Illinois. As part of her professional duties, she will collaborate with other psychiatrists and clinicians within the Illinois Department of Corrections and discuss a patient's mental health symptoms, diagnoses, and treatment plan. Oftentimes, her involvement in a patient's mental health treatment derives from another psychiatrists' request for a non-formulary medication. In her role with Wexford, she did not personally provide psychiatric services to Plaintiff at Dixon, and did not interact with him personally. (*Id.* at ¶ 4.)

Plaintiff admitted that he was never seen or treated by Drs. Vela Pinto and McCormick. (*Id.* at ¶ 5.)

Wexford held a contract with the State of Illinois to provide medical care and treatment to inmates at various correctional facilities throughout the Illinois Department of Corrections,

including Dixon.  (*Id.* at ¶ 6.)

### *Psychotropic Medications and Nonformulary Medication Requests*

Psychiatrists working in the Illinois Department of Corrections may prescribe formulary medications from the IDOC's formulary, meaning they are on a list of pre-approved medications that are readily available to providers to prescribe to inmates.  Psychiatrists may also prescribe other non-formulary medications, which require approval from a Wexford Regional Psychiatrist before they can be dispensed.  (*Id.* at ¶ 7.)

If a psychiatrist submits a non-formulary medication request for a patient, a Regional Psychiatrist will review the clinician's referral, the information contained therein, the patient's pertinent history and diagnoses to the extent any additional records are included, and a list of other formulary medications that the patient has tried.  The Regional Psychiatrist will approve or deny the non-formulary request based on their review and consideration of this information and their clinical judgment.  If the Regional Psychiatrist denies a non-formulary request, they will note that formulary medication options remain available to be tried first.  (*Id.* at ¶ 8.)

Based on Drs. Thapar, McCormick, and Vela Pinto's review of Plaintiff's mental health records, he had a self-reported history of depression, drug and alcohol abuse.  Treatment for depression can include pharmacological and non-pharmacological modalities, such as individual or group therapy.  There are many medications that can be used to treat a patient with depression, including, but not limited to: Prozac, Paxil, Zoloft, Lexapro, Celexa, Cymbalta, Remeron, and Trazodone.  Wellbutrin may be used to treat patients with depression, but is not listed on the IDOC's formulary.  However, it can be requested by a clinician with the submission of a non-formulary request to a Wexford Regional Psychiatrist.  (*Id.* at ¶ 9.)

If the Regional Psychiatrist approves the non-formulary request, the medication can be

prescribed and dispensed. Before non-formulary medications can be prescribed, a patient should first exhaust adequate trials of all relevant formulary medications, with a few exceptions if warranted. (*Id.* at ¶ 10.)

Additionally, in the event an inmate's psychiatric medication is discontinued, most medications will be steadily tapered to lower dosages to prevent adverse side effects from a sudden discontinuance. Plaintiff admitted that he was informed of the decision to discontinue his Wellbutrin in advance of the discontinuance and was tapered off the medication over a period of several months; he testified that when he described his discontinuance from Wellbutrin as "abrupt" in his Second Amended Complaint, he meant to suggest this was, in his view, done without a proper alternative plan. (*Id.* at ¶ 11.)

Wellbutrin, which can be used to treat depression, is known to be commodified, hoarded to be abused, and trafficked in a prison environment, which warrants extra consideration before it should be prescribed. In Plaintiff's case, he was housed in the general population at the Dixon Correctional Center, where Wellbutrin is known to be hoarded, trafficked, and traded. This can lead to other inmates who do not have a medical need for Wellbutrin gaining possession of the drug and abusing it by crushing and snorting it. (*Id.* at ¶ 12.)

### *Plaintiff's Mental Health History and Treatment Prior to his Incarceration at Dixon Correctional Center*

Plaintiff testified that he was diagnosed with major depression sometime in the early 1990s, while outside of the Department of Corrections, at a mental health facility in Aurora, Illinois. (*Id.* at ¶ 13.)

Plaintiff does not recall the extent of medications he took prior to his incarceration in the IDOC, nor does he recall the dosages of any of the medications he took. Contrary to his allegations in the operative complaint, Plaintiff testified that he did not take Wellbutrin prior to incarceration

7

at Dixon.  (*Id.* at ¶ 14.)

Plaintiff testified that after his transfer to Stateville Correctional Center in 2001, he voluntarily ceased taking mental health medications.  He testified that at his next correctional institution, Western Correctional Center, he continued to avoid taking medications.  (*Id.* at ¶ 15.)

### *Plaintiff's Mental Health Treatment and Care at Dixon Correctional Center*

Plaintiff testified that his first psychologist at Dixon was Dr. Rachael Wright.  Plaintiff does not recall when he first saw Dr. Wright, nor does he recall the extent of medications she prescribed for him, the dosages of these medications he took, or the length of time for which he took these medications.  (*Id.* at ¶ 16.)

On September 25, 2020, Dr. Brian Thomas, a regional psychiatrist with Wexford, approved a two-month continuation of Wellbutrin specifically to allow for further evaluation by Plaintiff's then-primary psychiatrist, Dr. Al Doyle.  At that time, Dr. Doyle was on a hiatus from working at Dixon and was unavailable to fully explain Plaintiff's pharmacological history or the necessity for the non-formulary medication Wellbutrin.  At that time, Plaintiff's pharmacy records showed he had only previously tried Cymbalta and Prozac.  (*Id.* at ¶ 17.)

On December 8, 2020, Dr. Thomas approved an additional one-month continuation of Plaintiff's Wellbutrin, to allow the on-site clinicians to further evaluate the necessity of this medication, if any.  (*Id.* at ¶ 18.)  On December 29, 2020, Dr. Thomas approved an additional two-month continuation of Plaintiff's Wellbutrin, to allow the on-site clinicians to further evaluate the necessity of this medication, if any.  (*Id.* at ¶ 19.)

On March 3, 2021, Dr. Scott McCormick reviewed a non-formulary request for Plaintiff's Wellbutrin.  He approved a three-month tapering of Plaintiff's Wellbutrin, which was to be discontinued after that time.  Upon his review of Plaintiff's pharmacy records and the emails

discussing the prior non-formulary requests for Wellbutrin, Dr. McCormick noted that there was no demonstrated need for this medication, and Dr. Doyle had never returned to Dixon to provide a justification for the medication. Dr. McCormick noted there were multiple formulary medications that Plaintiff had yet to try. (*Id.* at ¶ 20.)

On May 25, 2021, Dr. Vela Pinto advised that Plaintiff was to be tapered off Wellbutrin because his pharmacy records indicated that he only tried Cymbalta and Prozac. She noted that several formulary options remained to be tried. Further, she noted that Plaintiff's subjective reports about medications he supposedly had tried in the past were not a sufficient justification for prescribing a non-formulary medication, particularly one susceptible to being misused and traded at Dixon such as Wellbutrin. Dr. Vela Pinto approved Plaintiff's Wellbutrin for an additional 3 months, but for tapering purposes, with the expectation that Plaintiff be tried on formulary alternatives. (*Id.* at ¶ 21.)

On July 5, 2021, Dr. Thapar saw Plaintiff for a mental health appointment. He noted Plaintiff had a prior history of depression as well as drug and alcohol abuse. During this appointment, Plaintiff claimed he had tried Remeron, Effexor, Prozac, Paxil, Zoloft, Cymbalta, Trazodone for his depression in the past, but the Dixon pharmacy records only showed Plaintiff had tried Cymbalta and Prozac. He noted that Plaintiff's Wellbutrin was being tapered down prior to the appointment, but that other staff in the Dixon healthcare unit had reported Plaintiff experiencing symptoms of increased depression. Therefore, he continued Plaintiff Wellbutrin for an additional 30 days. (*Id.* at ¶ 22.)

On August 2, 2021, Dr. Thapar saw Plaintiff for a mental health appointment. During this appointment, he again noted Plaintiff's claims that he took past medications of Remeron, Effexor, Prozac, Paxil, Zoloft, Cymbalta, Trazodone for his depression, but that the Dixon pharmacy only

had records of Plaintiff trying Cymbalta and Prozac. Dr. Thapar's notes indicate that he planned to continue Plaintiff's Wellbutrin. (*Id.* at ¶ 23.)

On August 4, 2021, Dixon pharmacy personnel specifically advised Dr. Thapar that prior to being prescribed Wellbutrin, Plaintiff had only tried Cymbalta and Prozac for a short time in February and March 2019, and had taken Wellbutrin in June 2019. (*Id.* at ¶ 24.)

On August 25, 2021, Dr. Vela Pinto reviewed and denied Dr. Thapar's non-formulary request for Wellbutrin for Plaintiff. She noted that the prior extensions of the Wellbutrin prescription were approved solely as a taper for the medication. She noted that Plaintiff's refusals to try other formulary medications and grievances were not sufficient to justify a prescription for Wellbutrin, which is highly misused. Dr. Vela Pinto noted that, upon review of her non-formulary request form, that Dr. Thapar had not provided any objective reason why a prescription for Wellbutrin was necessary. She noted that he could appeal her decision. (*Id.* at ¶ 25.)

On August 29, 2021, Dr. Thapar saw Plaintiff for a mental health follow up appointment, at which time Plaintiff had been weaned off his Wellbutrin, ending on August 25, 2021. Dr. Thapar again noted the contrast in Plaintiff's reports of prior medication trials, while the Dixon pharmacy reported that Plaintiff only trialed Cymbalta and Prozac. Based on Plaintiff's requests for Wellbutrin, Dr. Thapar submitted another non-formulary request for a 30-day continuation of Plaintiff's Wellbutrin and otherwise continued his Wellbutrin until September 3, 2021, while waiting for a decision on his non-formulary request. (*Id.* at ¶ 26.)

On August 30, 2021, Dr. McCormick reviewed and denied an appeal Dr. Thapar submitted to obtain Wellbutrin for Plaintiff. In reaching this decision, he noted that Plaintiff's pharmacy records showed he had only tried Cymbalta, Prozac, and Remeron, and that he had not completed a sufficient trial of those medications. Thus, there were formulary options that remained for

Plaintiff to try.  (*Id.* at ¶ 27.)

On September 27, 2021, Dr. Thapar saw Plaintiff for a mental health appointment.  At this time, he advised Plaintiff that the non-formulary request he submitted for him had been denied, due to Plaintiff's prior inadequate trials of Prozac, Cymbalta and Remeron, and the availability of several formulary options.  Although Dr. Thapar spent additional time at this appointment discussing medication options with Plaintiff, Plaintiff refused to take any medication other than Wellbutrin.  Dr. Thapar noted that Plaintiff was clear and coherent in his thought process, had normal speech and good eye contact, and that his mood and affect appeared to be normal.  He planned a further follow-up with Plaintiff and advised him to notify staff of worsening mood or if he developed suicidal or homicidal ideations.  (*Id.* at ¶ 28.)

On October 14, 2021, Dr. Thapar met with Plaintiff for a follow-up appointment.  At this time, Plaintiff agreed to try the anti-depressant Paxil.  (*Id.* at ¶ 29.)

On November 4, 2021, Dr. Thapar saw Plaintiff for a routine follow-up appointment. Plaintiff claimed that his Paxil made him "fat" and caused him "GI side effects," and he wanted it discontinued.  Based on this representation, Dr. Thapar discontinued his Paxil and instead prescribed him a trial of Zoloft, another medication used to treat depression.  (*Id.* at ¶ 30.)

On November 29, 2021, Dr. Thapar saw Plaintiff for a routine mental health appointment. At this time, Plaintiff advised that he took his Zoloft only for a few weeks, and stated it made him "sick."  Plaintiff advised that he wanted to "clear [his] system" and cease taking psychotropic medications for an unspecified period before starting a new medication.  Pursuant to these statements, Dr. Thapar discontinued Plaintiff's Zoloft and otherwise advised him to notify staff of worsening mood or if he developed suicidal or homicidal ideations.  (*Id.* at ¶ 31.)

On December 20, 2021, Dr. Thapar saw Plaintiff for a follow-up mental health

appointment. Dr. Thapar noted that, per Plaintiff's pharmacy records, he had inadequate trials of Prozac, Cymbalta and Remeron but most of these medications, like his Zoloft, were discontinued due to Plaintiff's reports of GI side effects. Based on this observation, and Plaintiff's requests, Dr. Thapar planned to submit another non-formulary request to obtain Wellbutrin for Plaintiff. (*Id.* at ¶ 32.)

On December 27, 2021, Dr. Vela Pinto reviewed and denied Dr. Thapar's non-formulary request. In her response, Dr. Vela Pinto noted that, after reviewing old requests and the then-current request for Wellbutrin for Plaintiff, she did not see any new information about why Wellbutrin specifically was needed. She noted that, given Plaintiff's limited trial history with formulary medications, several of which only had one medication fill, that there were several formulary options which remained to be tried. (*Id.* at ¶ 33.)

On January 17, 2022, Dr. Thapar was unable to see Plaintiff for a follow-up appointment due to a lockdown at the prison due to the spread of COVID-19. Instead, he reviewed Plaintiff's chart and medication administration record. He noted the last non-formulary request for Wellbutrin that he submitted had been denied because there were additional formulary medications that Plaintiff needed to try before the non-formulary request could be approved. Dr. Thapar noted that, as of this date, Plaintiff was not prescribed any psychotropic medications. He noted that other mental health providers had told him Plaintiff was not having any acute issues or concerns at that time and planned to see him in another week or two. (*Id.* at ¶ 34.)

On February 3, 2022, Dr. Thapar saw Plaintiff for a follow-up, at which time he advised Plaintiff that his latest requests for Wellbutrin were denied. Plaintiff requested that Dr. Thapar appeal this decision again, claiming that he had failed prior trials of all formulary medications due to "GI side effects." Plaintiff declined to try any other medications at that time. Dr. Thapar

planned to review Plaintiff's pharmacy records to check the formulary medications he had tried and planned to follow up with Plaintiff in a month. (*Id.* at ¶ 35.)

On February 28, 2022, Dr. Thapar met with Plaintiff for a follow-up appointment, at which time Plaintiff again demanded Wellbutrin. He explained to Plaintiff that there were other formulary medications he had not tried, or adequately tried, for his depression. Dr. Thapar told Plaintiff that he needed to first try all formulary medications for depression to their highest recommended dosages, and for an adequate time, before a request for Wellbutrin would be approved. Despite explaining this to Plaintiff, Plaintiff refused any antidepressants at that time. (*Id.* at ¶ 36.)

On March 24, 2022, Dr. Thapar saw Plaintiff for a routine follow-up appointment. He reviewed Plaintiff's pharmacy records with him at that time, and noted that Plaintiff had inadequate trials of Prozac, Cymbalta, and Remeron, and that there were several other formulary options that remained for trial. At this time, Plaintiff agreed to try another antidepressant, Celexa, and Dr. Thapar prescribed this medication for him. (*Id.* at ¶ 37.)

On April 21, 2022, Dr. Thapar saw Plaintiff for a follow-up appointment. At this time, Plaintiff advised that his Celexa was helpful but discussed modifications to the dosage to further address mood symptoms. Plaintiff also reported GI issues. Based on these representations, Dr. Thapar increased the dosage of Plaintiff's Celexa and modified the timing of his dosage to address his reported GI issues. (*Id.* at ¶ 38.)

On May 19, 2022, Dr. Thapar met with Plaintiff for a further follow-up appointment. At that time, he noted that Plaintiff had been refusing to take Celexa because it allegedly caused him "GI side effects." Pursuant to his requests, he discontinued Plaintiff's Celexa and planned to submit another non-formulary request for Wellbutrin at Plaintiff's insistence. (*Id.* at ¶ 39.)

On May 23, 2022, Dr. McCormick and Dr. Vela Pinto discussed (over email) Dr. Thapar's non-formulary request to obtain Wellbutrin for Plaintiff. They noted that Plaintiff had not completed adequate trials of formulary medications and that other formulary medications remained to be tried for Plaintiff's reported depression. Dr. McCormick also expressed his concerns for potential abuse, trafficking, hoarding, or trading of Wellbutrin in the inmate population. (*Id.* at ¶ 40.)

On May 24, 2022, Dr. Vela Pinto advised Dr. Thapar that the non-formulary request was not approved. She noted, again, that Plaintiff had not completed adequate trials of Remeron, Paxil, Zoloft, or Cymbalta and had not tried Lexapro or Trazadone. She also noted that the non-formulary form did not contain sufficient information and only contained only subjective complaints from Plaintiff about his purported depression. Dr. Vela Pinto noted that the non-formulary request did not contain any information regarding any impairment of function due to Plaintiff's purported depression, no documentation of the severity of his illness, or other objective symptoms to justify the use of Wellbutrin. She noted that Dr. Thapar had not provided any new information in the non-formulary request from prior requests, and that the request appeared to be submitted solely upon Plaintiff's insistence. Dr. Vela Pinto also noted that Wellbutrin is well known to be misused, trafficked, and traded at the Dixon Correctional Center, and advised Dr. Thapar that he could appeal the non-approval. (*Id.* at ¶ 41.)

On June 16, 2022, Dr. Thapar met with Plaintiff for a further follow-up appointment, at which time he advised Plaintiff that the non-formulary request for Wellbutrin was not approved due to Plaintiff's inadequate trials of Paxil, Zoloft, Prozac, Cymbalta, Remeron, and because he had not tried Lexapro or Trazadone. Plaintiff told Dr. Thapar he did not want to try any formulary medications for his purported depression, claimed he tried them all, and claimed he had GI side

14

effects on many of the formulary medications. Dr. Thapar advised Plaintiff that a non-formulary request for Wellbutrin would not be approved as he had not tried any of the formulary medications to adequate levels. Plaintiff declined any psychotropic medications at this time. (*Id.* at ¶ 42.)

On July 18, 2022, Dr. Thapar met with Plaintiff for a mental health appointment, at which time he agreed to a trial of Lexapro and Abilify. At that time, Dr. Thapar prescribed these medications for Plaintiff. (*Id.* at ¶ 43.)

On August 8, 2022, Dr. Thapar saw Plaintiff for another mental health appointment. Plaintiff advised that he had "some" sad days, but did not report side effects from his Lexapro or Abilify and otherwise appeared to be stable. Dr. Thapar planned to continue Plaintiff's Lexapro and Abilify while monitoring his condition for any change or side effects. (*Id.* at ¶ 44.)

On September 10, 2022, Dr. Thapar was scheduled to see Plaintiff for a follow-up appointment but was unable to due to the prison being on a lockdown. Instead, he conducted a chart review and review of Plaintiff's Medication Administration Records (MARs). He noted that Plaintiff was compliant with his medications and other mental health providers had not noted any deterioration or change in Plaintiff's symptoms since their last appointment. He continued Plaintiff's Lexapro and Abilify and planned to follow up with him in two to four weeks. (*Id.* at ¶ 45.)

On October 3, 2022, Dr. Thapar saw Plaintiff for a follow-up appointment. At that time, Plaintiff stated he wanted to discontinue his medications due to a weight gain of 15 to 20 pounds in two months. Dr. Thapar discontinued Plaintiff's Lexapro and Abilify per his request. (*Id.* at ¶ 46.)

On November 3, 2022, Dr. Thapar saw Plaintiff for a routine follow-up appointment. Plaintiff stated that his mood was worsening and that he had anxiety, but he did not want to try

15

any other formulary medications at that time. He planned to see Plaintiff again in four weeks and advised him to notify staff of worsening mood or if he developed suicidal or homicidal ideations. (*Id.* at ¶ 47.)

On December 3, 2022, Dr. Thapar attempted to meet with Plaintiff for a follow-up appointment but was unable to do so as the facility was on a lockdown at that time. Instead, he reviewed Plaintiff's chart and MARs and noted that, while Plaintiff was not on psychotropic medications at that time, other mental health staff that had seen Plaintiff did not notice or report any acute issues with his mental health. Dr. Thapar planned to see Plaintiff again in four weeks. (*Id.* at ¶ 48.)

On January 2, 2023, Dr. Thapar met with Plaintiff for a routine follow-up appointment. At that time, he noted Plaintiff was doing poorly and presented with a blunt and constricted affect, low mood, amotivational symptoms, loss of interest, and worsening sleep and appetite. Based on these observations, Dr. Thapar prescribed a short-term course of Wellbutrin and planned to submit another non-formulary request for a long-term prescription of Wellbutrin. (*Id.* at ¶ 49.)

On January 26, 2023, Dr. Thapar met with Plaintiff again, at which time he reported improvement in his symptoms. At this time, Dr. Thapar noted that his non-formulary request for a three-month prescription of Wellbutrin for Plaintiff was approved, and his medication was continued. (*Id.* at ¶ 50.)

In Drs. Thapar, Vela Pinto, and McCormick's' opinion, it was appropriate to prescribe and exhaust the medications available on the IDOC's formulary to treat Plaintiff's anxiety and self-reported depression given the safety and security risks of prescribing Wellbutrin to a patient in general population, including the potential for hoarding, abuse, and trafficking, which can pose a risk of harm to other inmates. Further, they did not see sufficient objective evidence that Plaintiff's

mental health issues were interfering with his ability to function on a day-to-day basis. Also, Plaintiff had a history of drug and alcohol abuse, which raised the concern that his demands for Wellbutrin had a secondary motive, namely recreational use of Wellbutrin. Plaintiff also did not provide any concrete information about any prior mental health treatment before his incarceration, including the names of providers or facilities where he was an inpatient, from which they could obtain corroborating information about his prior use of medications for his purported depression and anxiety, if any. (*Id.* at ¶ 51.)

At no time did Drs. Thapar, McCormick, or Vela Pinto turn Plaintiff away, disregard his complaints, or otherwise deny him appropriate mental health care and treatment. (*Id.* at ¶ 52.)

In preparing and submitting the non-formulary requests for Plaintiff, Dr. Thapar relied upon the information provided by Plaintiff and from his mental health records, including any pertinent mental health history, symptoms, diagnoses, and prior medications. Further, Dr. Thapar included additional information from on-site mental health staff about his objective presentation, and his pharmacy/medication administration records. (*Id.* at ¶ 53.)

In reviewing the non-formulary requests submitted by the treating physicians, Drs. McCormick and Vela Pinto relied upon the information contained therein as well as Wexford's pharmacy records. (*Id.* at ¶ 54.)

Wexford Health Sources, Inc. does not publish or promulgate mental health policies or guidelines. The Illinois Department of Corrections' Administrative Directives and Institutional Directives govern the delivery of mental health services to inmates. Wexford does not have a policy or practice to abruptly end an inmate's mental health medications, and such medications are typically tapered before they are stopped. (*Id.* at ¶ 55.)

Wexford does not impose any restrictions on the prescription of medications based on their

17

cost. At no time did the cost of Plaintiff's mental health medications factor into Drs. Thapar, Vela Pinto, or McCormick's' submission of or review of non-formulary requests. (*Id.* at ¶ 56.)

At no time in treating Plaintiff were Drs. Thapar, McCormick, or Vela Pinto relying on any policy, procedure, or guideline published by Wexford Health Sources, Inc. (*Id.* at ¶ 57.)

On review of Plaintiff's mental health records, Drs. Thapar, McCormick, and Vela Pinto did not see any evidence that his mental health treatment caused him any harm. (*Id.* at ¶ 58.)

Plaintiff admitted he does not know how long a trial of Prozac, Remeron, Cymbalta, or Paxil is supposed to last. (*Id.* at ¶ 59.)

Plaintiff admitted that, to the extent other inmates were taken off Wellbutrin around the same time as him, he does not know why they were also taken off the medication. (*Id.* at ¶ 60.)

Plaintiff does not recall when Dr. Thapar tried him on alternative medications, nor does he recall the dosages that he took of any of the alternative medications. (*Id.* at ¶ 61.)

Plaintiff admitted he did not seek medical care for the alleged stomach pains he experienced when taking alternative mental health medications under Dr. Thapar's care. (*Id.* at ¶ 62.)

Plaintiff admitted that no medical professionals told him his stomach pains were caused by mental health medications, but that he reached this conclusion based on his own lay experience. (*Id.* at ¶ 63.)

Plaintiff testified that his belief Wexford has/had a policy to discontinue Wellbutrin for cost-saving purposes came from his understanding of the collegial review process and further admitted that he was unaware of whether this collegial review process applied to prescription medications. (*Id.* at ¶ 64.)

Plaintiff admitted that he did not know whether Wexford was the entity that designated medications formulary or nonformulary. (*Id.* at ¶ 65.)

18

Plaintiff admitted that he does not know what records Drs. Vela Pinto and McCormick reviewed to determine whether he should or should not have been on Wellbutrin.  (*Id.* at ¶ 66.)

Plaintiff admitted he does not know the cost of Wellbutrin or any other mental health prescription medications.  (*Id.* at ¶ 67.)

Plaintiff admitted that, when he was placed back on Wellbutrin, it was not contrary to any Wexford policies.  (*Id.* at ¶ 68.)

Plaintiff admitted that he did not sustain any physical injuries or symptoms during the period of complaint during which he was required to forego Wellbutrin, and that his experience was limited to sadness and emotional distress.  (*Id.* at ¶ 69.)

Plaintiff admitted he is "fine today" and has no prospect of future harm because of his time off Wellbutrin in 2021 and 2022.  (*Id.* at ¶ 70.)

Plaintiff admitted that, when he stopped taking alternative medications offered to him, he did so before consulting his doctor.  (*Id.* at ¶ 71.)

Plaintiff admitted he did not recall how long he took any psychotropic medication before he stopped taking it.  (*Id.* at ¶ 72.)

Plaintiff admitted he does not know how long it takes alternative mental health medications to become clinically effective.  (*Id.* at ¶ 73.)

## III.    Summary Judgment Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby*, Inc., 477 U.S. 242, 248 (1986); *see also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

## IV. Discussion

### A. Plaintiff's Eighth Amendment Medical Care Claim against Defendants Dr. Thapar, Dr. McCormick, and Dr. Vela Pinto

"The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (cleaned up). To prevail on a claim that his medical care violated the Eighth Amendment, the plaintiff must establish that: (1) he suffered from an objectively serious medical condition and (2) the defendants were deliberately indifferent to that condition. *See id.* at 1022 (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

The parties do not address the first prong of the analysis, but Plaintiff's mental health issues (for which he received treatment and medication) constitute an objectively serious medical

20

condition. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."); *see also Sanville v. McCaughtry*, 266 F.3d 724, 728 (7th Cir. 2001) (recognizing mental illness as a serious medical need). However, the claim fails on the second prong of the analysis.

At the outset, the Court observes that Plaintiff filed this case in 2021, alleging that he suffered from long-standing mental health issues and that IDOC personnel failed to adequately respond to these issues. (*See* Dkt. 1, Plaintiff's original complaint.) In March 2022, the Court found that Plaintiff's allegations were sufficient to "warrant[] investigation and thus recruit[ed] counsel to represent him." (Dkt. 12 at pg. 4.) Subsequently, recruited counsel was permitted to withdraw after he explicitly represented to the Court that he could not file an amended complaint consistent with his Rule 11 obligations. (*See* Dkts. 25, 26.) At that point, Plaintiff was permitted to proceed on a *pro se* basis and the Court accepted his *pro se* amended complaint (Dkt. 40), finding that his allegations were sufficient, *at the pleading stage*, to state an Eighth Amendment medical deliberate indifference claim. (*See* Dkt. 41, emphasis added.) But, at this stage of the proceedings, and on a developed record, it is clear that the claim cannot proceed further.

In this regard, deliberate indifference consists of more than negligence or malpractice; the defendant must know of and disregard an excessive risk to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The requisite culpable state of mind for deliberate indifference is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

To prevail in a case like this (where the record is replete with evidence showing that Plaintiff received regular care for his mental health issues), the Court needs evidence that the

treatment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" in order to infer culpability. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). In assessing a claim that a prisoner was subjected to treatment by medical professionals devoid of medical judgment, the Court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

Here, the evidence in the record shows that treating psychiatrist Dr. Thapar repeatedly made non-formulary requests for Wellbutrin that were rejected by regional psychiatrists Drs. McCormick and Vela Pinto because Plaintiff had not tried, or had not adequately tried, the formulary options. In denying the various requests, Drs. McCormick and Vela Pinto also cited safety/security reasons and noted that they did not see a reason why Wellbutrin was needed. The record shows that Dr. Thapar consistently responded to Plaintiff's complaints both by continuing to request Wellbutrin, and when that was not successful, prescribing formulary options and adjusting Plaintiff's medication based on Plaintiff's complaints. While Plaintiff contends that he refused the formulary options because they caused him stomach problems (*see* Dkt. 163), he has not come forward with any medical evidence documenting those issues or linking them to his anti-depressant use.

On this record, no reasonable jury conclude that Defendants acted with deliberate indifference to Plaintiff's mental health issues. There is nothing in the lengthy sequence of events set forth above that suggests that the particular medical decisions made by Defendant Thapar (as Plaintiff's treating psychiatrist) and/or Drs. Vela Pinto and/or McCormick (as regional

psychiatrists responsible for reviewing Dr. Thapar's specific requests for Wellbutrin) were "so far afield of accepted professional standards as to raise the inference that [they] [were] not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (a medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under these circumstances").

Plaintiff's summary judgment materials are disorganized and difficult to follow. That said, it is clear from these materials that he is dissatisfied with the provision of mental health treatment/care he received from Defendants during the time period relevant to this lawsuit.

In his memorandum of law, and despite the substantial evidence in the record showing his treatment over the course of two years, Plaintiff maintains that Dr. Thapar "violated his constitutional rights when he denied and delayed [him] mental health care." (Dkt. 163 at pg. 3.) He asserts that Dr. Thapar did not "always use[] his clinical judgment in treating [him][,]" that Dr. Thapar "took [him] completely off the Wellbutrin medication and he knew it was working for [him][,]" that Dr. Thapar had "no alternative medication to put [him] on" and "refused" to provide him with anti-depressant medication. (*Id.*) Plaintiff makes similar statements with respect to Drs. McCormick and Vela Pinto, contending that they persisted in treating him in a manner that they knew was ineffective. (*Id.* at pgs. 6-8.) Plaintiff's statements are belied by the record before this Court, which shows that: Dr. Thapar consistently adjusted Plaintiff's medication in response to his complaints; Dr. Thapar continued to request Wellbutrin for Plaintiff through the procedures in place for obtaining a non-formulary drug; and, Dr. Thapar's requests were denied at the regional level by Drs. McCormick and Vela Pinto for the specific reasons discussed above.

The Court notes that Plaintiff also argues in his memorandum of law that Defendants failed

23

to review his "complete mental health records" and failed to talk to his family members about his mental health history. (*Id.* at pgs. 3-8.) It is not entirely clear to the Court what Plaintiff means by his "complete mental health records." Plaintiff seems to be referring to certain medical records from the 1990s and 2000s, which he has attached to his response. (*See* Dkt. 162-1.) To the extent that these are the documents he is referring to, his reliance upon them to defeat summary judgment is problematic for a number of reasons.

Initially, there is some question as to whether Plaintiff ever produced these documents during discovery; Defendants maintain that Plaintiff did not and the Court therefore should disregard them. (*See* Dkt. 167 at pgs. 1-2.) Plaintiff, on the other hand, seems to be indicating that he produced some, but not all, of these records during discovery. (*See* Dkt. 171 at pg. 2.) The Court need not resolve the dispute, as consideration of the records do not change the Court's analysis that Defendants are entitled to summary judgment.

First, there is no evidence in the record that Defendants had the particular records at or during the time period relevant to this suit, and Plaintiff has not provided any meaningful explanation as to why he did not provide them to Dixon personnel in 2021 or beyond. Second, even if Defendants had reviewed them, the records date back *to the 1990s*, such that it is unclear what value, if any, they would have had in connection with Plaintiff's mental health treatment decades later in *2021 and beyond*. Third, it is unclear what conclusion Plaintiff is asking the Court to draw from the various records. For instance, a number of the records list or identify medications that Plaintiff seems to have been prescribed and/or taken while he was incarcerated (*see e.g.*, Dkt. 162-1 at pgs. 9-14). But the records contain no physician notes or details about the various medications, Plaintiff's experiences with these medications (including how long he took them), or any other information about Plaintiff's mental health treatment at those particular times. Fourth,

24

Plaintiff's failure to try/complete adequate trials of prior formulary anti-depressant medications – which may be the reason why Plaintiff submitted the various records – was only one reason why Defendants Vela Pinto and McCormick denied his requests for Wellbutrin during the period from 2021 to 2023.[3]

Ultimately, it may be that Plaintiff preferred a particular type of care or treatment for his mental health issues, but his personal preference, without more, is simply not enough to establish deliberate indifference. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (a prison medical provider is not deliberately indifferent simply because he offers a different course of treatment than the one requested by the inmate); *see also Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (inmates are not entitled to "unqualified access to healthcare"); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmates are not entitled to best care possible); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (inmates have no right to demand specific treatment). While Plaintiff would like it some other way, the record in this case clearly shows that Defendants attended to Plaintiff's evolving mental health needs over a two-year period and their care and treatment decisions were reasonable under the circumstance and based on their clinical judgment.

Accordingly, Defendants Thapar, McCormick, and Vela Pinto are entitled to summary judgment on Plaintiff's Eighth Amendment medical deliberate indifference claim, and their motion is granted as to this issue.

### B. Plaintiff's *Monell* Claim against Wexford

Plaintiff has not shown a constitutional problem with his medical care (for the reasons

---

[3] The Court observes that Plaintiff may have also submitted the records in an attempt to show that Defendant Thapar was deliberately indifferent to his mental health needs because his treatment decisions were different than Plaintiff's previous medical providers. But that argument is a non-starter, as a mere disagreement among providers does not amount to deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

discussed above), nor has he shown any evidence that that he was injured due to an institutional policy. In such circumstances, there is no municipal liability. *See Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (dismissing *Monell* claim that "suffer[ed] from two deficiencies: there is no proof of an underlying constitutional violation by any individual Wexford defendant nor any evidence that an institutional policy caused such a violation.").

Accordingly, Defendant Wexford is entitled to summary judgment on Plaintiff's *Monell* claim, and the motion for summary judgment is granted as to this issue.

## V.    Conclusion

Defendants' motion for summary judgment (Dkt. 140) is granted. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.


Date: January 12, 2026          By: _____
                                     Iain D. Johnston
                                     United States District Judge